**Elder Lewis BANKS, Plaintiff,**

v.

**JEFFERSON–SMURFIT, Defendant.**

**No. 1:00CV00814.**

United States District Court, M.D. North Carolina.

Dec. 18, 2001.

Elder Lewis Banks, Greensboro, NC, pro se.

Fred T. Hamlet, Greensboro, NC, for defendant.

## MEMORANDUM OPINION

OSTEEN, District Judge.

This matter is before the court on Defendant Jefferson Smurfit's Motion for Summary Judgment, Plaintiff Elder Lewis Banks' Motion to Be Relieved of the Obligation to Pay for Mediator's Fee, and Defendant's Motion to Strike Affidavits to Plaintiff's Response Brief to Defendant's Motion for Summary Judgment.[1] For the

---

1. Plaintiff has also filed two additional motions styled "Plaintiff's Motion to Dismiss the Defendant's Answer Failure to State a Claim Upon Which Relief Can Be Granted" [4] and

"Plaintiff's Motion to Dismiss and Objects to the Defendant's Motion and Memorandum to Strike Affidavits of John Means Geroge [sic] Moyer Shaney Suffern [sic] and Other Materi-

reasons set forth herein, Defendant's Motion for Summary Judgment will be granted. Plaintiff's Motion to be Relieved of the Obligation to Pay for Mediator's Fee and Defendant's Motion to Strike will be denied.

## I. INTRODUCTION

Plaintiff Elder Lewis Banks, acting *pro se*, initiated this action against his former employer, Defendant Jefferson–Smurfit, on August 25, 2000, asserting violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, 42 U.S.C. § 1981, 42 U.S.C. § 1983, and the U.S. Constitution. Plaintiff, who is black, claims that Defendant discriminated against him by failing to promote Plaintiff to a position filled by a white man, discharging Plaintiff on the basis of his race, and retaliating against him for filing grievances with the union. Defendant asserts that Plaintiff's claims lack merit and moves for summary judgment. For the following reasons, Defendant's motion will be granted.

## II. FACTS

Plaintiff commenced his employment at Defendant's folding carton and boxboard manufacturing facility in Greensboro in December 1996. After working for six months in the finishing department, Plaintiff was reassigned to an entry-level "sheeter" job in the printing department. Plaintiff was responsible for operating a machine which cut boxboard to the size specified by the customer.

In December 1997, Defendant hired Kevin Wells for the position of second pressman in the printing department. The second pressman position was two levels above the sheeter position in the printing department's job progression. Mr. Wells was hired due to his previous training on printing presses. Plaintiff had no such experience and had not been trained for the second pressman position. (Def.'s Mot. Summ. J., Seel Aff. ¶¶ 3–6.)[2]

On January 5, 1998, Plaintiff filed a grievance with the local union protesting Defendant's hiring of Mr. Wells without first posting the position internally. Under the collective bargaining agreement which existed between Defendant and the Graphic Communications Union, Local 465–S, Defendant was required to post entry-level job openings internally before turning to the general public for applicants. If no current employee was deemed qualified for the position, Defendant was free to seek qualified applicants from outside of the company. Defendant was not required to post job openings for positions that were not entry-level. (Def.'s Resp. Opp'n Pl.'s Mot. Order Compelling Disclosure or Disc., attachment to Def.'s Resp. Pl.'s Interrogs.)

Defendant also had an agreement with the union regarding the continuous operation of its machinery at peak production times. If production requirements demanded, the plant would operate 24 hours a day, with workers relieving each other as the shift changed so that the machines were never shut down. It was Defendant's policy that whenever the company was in such "continuous operations," an employee could not leave his post until properly relieved, and would be required

---

al the Defendant's Motion and Memorandum to Strike Affidavits and Other Material" [61]. These motions have no basis in fact and Plaintiff cited no law to make them material. They are subject to disposal without further elaboration.

2. According to Plaintiff, however, he was asked to help train Mr. Wells on the operation of the press. (Compl. ¶ 1.)

to work overtime if necessary until a replacement was located. (*Id.*)

On January 15, 1998, a Thursday, Plaintiff was working the second shift, from 3 p.m. to 11 p.m. Before the end of his shift, Plaintiff was approached by his supervisor and told that his replacement, the third-shift sheeter, would not be coming to work that night. Plaintiff responded that he was not staying late and would be going home at the end of his shift.

Plaintiff's supervisor reported this to his own superior, Mark Grubbs, who then told the shift supervisor, Mr. Lukasik. After reviewing the outputs of Plaintiff's machine, Mr. Lukasik decided that Plaintiff's machine did not need to be run continuously that night. Mr. Grubbs then told Plaintiff he could go home because he was not needed. He also reminded Plaintiff that if his replacement did not show up, Plaintiff could be required to work overtime of up to four hours. Plaintiff punched out at 11:05 p.m. and went home. (Pl.'s Dep. filed June 20, 2001 Ex. 7 (Arb.Op.), at 4–5.)

The following day, Friday, January 16, 1998, Plaintiff heard other employees discussing the fact that Plaintiff had left work the previous night without being relieved. Plaintiff asked them if he could be terminated for leaving before his replacement arrived. They told Plaintiff that he could. (*Id.* at 5.)

Later that evening, Plaintiff's replacement called in once again to report that he would not be in to work. This message was not immediately received by any of the supervisors, however, and was not communicated to Plaintiff. At the end of his shift on January 16, Plaintiff shut down his machine without being relieved. He then turned in his paperwork to Mr. Lukasik in the office, who told Plaintiff to have a good weekend. Plaintiff clocked out at 11:05 p.m. and went home. (*Id.*)

About 20 minutes later, Mr. Grubbs noticed that Plaintiff's machine was dark and was not in operation. After checking the call-in sheet, Mr. Grubbs realized that Plaintiff's replacement had called in absent several hours before the end of the shift. Mr. Grubbs then called Mr. Lukasik at home, who said he had not known that Plaintiff's replacement was absent and had not given Plaintiff permission to go home without being relieved. (*Id.*)

The next work day, Monday, January 19, 1998, a meeting was conducted between Plaintiff, Mr. Lukasik, and a union representative to discuss Plaintiff's conduct. When told that he was being charged with leaving his post without being relieved, Plaintiff became loud and boisterous and stated, "this is a modern day lynching." At the close of this meeting, Plaintiff was suspended pending further investigation. (*Id.* at 6.)

During the subsequent investigation, Plaintiff asserted that no one had told him that he was needed to stay late the night of January 16, as they had done in the past. He also argued that the plant had not been in continuous operations that night. Nevertheless, the plant manager found that Plaintiff had deliberately violated a clearly stated plant rule by leaving his post without being properly relieved and issued Plaintiff a letter of discharge dated January 27, 1998. (*Id.*)

Prior to this incident, other employees had been disciplined for walking off the job, but under different circumstances. Tony Stanley, a white employee, had left his post without being relieved and received a two-day disciplinary layoff. However, Mr. Stanley convinced his supervisors that he left only because he mistakenly believed he had seen his replacement arrive, when in fact the replacement had not arrived. He also expressed remorse for his conduct and promised it

would not happen again. (Def.'s Mot. Summ. J., Seel Aff. ¶¶ 12–14.)

Mary–An Anderson, another white employee, received a three-week disciplinary layoff without pay and six months' probation for walking off the job on a Sunday morning. Ms. Anderson had previously told her supervisor, who was absent on the day in question, that she could not work on Sundays due to her religious convictions. After expressing remorse for her actions and promising to meet certain conditions in the future, Ms. Anderson was allowed to return to work. (*Id.*)

Following Plaintiff's discharge on January 27, 1998, Plaintiff filed another grievance, asserting that he had been discharged for filing a grievance regarding Mr. Wells.[3] Pursuant to the collective bargaining agreement, the matter was referred to arbitration. After conducting a hearing on January 6, 1999, the arbitrator found Plaintiff guilty of violating company policy by leaving his post without being properly relieved. However, the arbitrator also found that under the circumstances, discharge was too severe a penalty, and ordered Plaintiff reinstated without back pay on April 15, 1999.[4] (Arb. Op. at 1, 11–15.)

Plaintiff also filed a charge with the Equal Employment Opportunity Commission ("EEOC") on February 5, 1998, complaining of racial discrimination and retaliation by Defendant. Following its investigation, the EEOC declined to pursue the matter further and issued Plaintiff a right-to-sue letter on December 8, 1999.[5]

After being reinstated, Plaintiff filed several additional grievances against Defendant, based on "harassment and retaliation." Plaintiff asserted that he had been unfairly deprived of seniority after being reinstated, that his supervisors had mistreated him, and that investigation of his previous grievances had been unfair, among other things. These grievances became the subject of several meetings between Plaintiff and management in the summer of 1999.

At several of the grievance meetings, Plaintiff attempted to open the meeting with a religious invocation.[6] After one such incident, a management representative informed Plaintiff that he was free to pray privately prior to his grievance meeting, but that open prayer in company forums would not be allowed. When Plaintiff attempted a similar invocation at the next meeting, the management representative terminated the meeting. Plaintiff filed another grievance in protest.[7]

In August 1999, Plaintiff was told by a supervisor that his production levels were low compared to other employees. Believing this to be unfair, Plaintiff filed another

---

3. Plaintiff filed a similar charge with the National Labor Relations Board ("NLRB"). This charge was deferred pending resolution of the union grievance.

4. The NLRB subsequently dismissed Plaintiff's charge as a result of the arbitrator's award.

5. Plaintiff originally filed suit in federal district court on February 10, 2000. The court dismissed that action without prejudice on August 17, 2000, for failure to assert that the Plaintiff had received a right-to-sue letter from the EEOC. The complaint in the present action, filed August 25, 2000, cured this defect.

6. According to Plaintiff, this invocation consisted of the statement, "I'd like to give honor to my Lord and Savior, Jesus Christ, for he is the power that made these proceedings today possible." (Pl.'s Dep. at 214, filed June 20, 2001.)

7. The subject of this grievance was never made part of Plaintiff's EEOC charge. (Pl.'s Dep. Exs. 3, 4, filed June 20, 2001.)

grievance. In October 1999, Plaintiff received a written warning regarding his level of absenteeism. Plaintiff filed another grievance, asserting that he was not given a verbal warning prior to receiving the written warning.

## III. DISCUSSION

### A. *Standard of Review*

Summary judgment is appropriate when the pleadings and other evidence show that there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. Proc. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The essential question for the court's determination is whether the evidence "is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986). Where the nonmoving party fails to make a sufficient showing to establish an essential element of its case, summary judgment is proper because a "complete failure of proof" on an essential element renders all other facts immaterial. *Celotex*, 477 U.S. at 322–23, 106 S.Ct. at 2552.

### B. *Analysis*

Plaintiff asserts that Defendant discriminated against him on the basis of his race in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, 42 U.S.C. § 1981 and 42 U.S.C. § 1983, by failing to promote Plaintiff to the position given to Kevin Wells, discharging Plaintiff for leaving his post without being relieved,

and retaliating against Plaintiff in various ways as a result of grievances he filed with the union. Defendant responds that Plaintiff has failed to establish a prima facie case of discrimination or retaliation because Plaintiff was not qualified for the position given to Mr. Wells and Plaintiff was appropriately disciplined for violating a clearly established plant rule.

■ At the outset, the court notes that Plaintiff may not rely on 42 U.S.C. § 1983 to advance his claims. Section 1983 provides a federal cause of action to those whose constitutional rights are violated by a state or local government actor.[8] As Defendant is a private employer, § 1983 does not provide Plaintiff with a cause of action against Defendant.

To survive summary judgment on his remaining claims, Plaintiff may proceed in either of two ways. First, Plaintiff may present direct evidence that race was a determining factor in Defendant's employment decisions. *See Equal Employment Opportunity Commission v. Northwest Structural Components, Inc.*, 822 F.Supp. 1218, 1219 (M.D.N.C.1993). Alternatively, if Plaintiff is unable to present direct evidence of discrimination, Plaintiff may establish his case through circumstantial evidence, using the *McDonnell Douglas* burden-shifting scheme.[9] *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973). Under this scheme, Plaintiff must first present evidence demonstrating a prima facie case of discrimination. *See id.* If Plaintiff succeeds in establishing a prima facie case, the burden of proof

---

**8.** *See Monroe v. Pape*, 365 U.S. 167, 172, 81 S.Ct. 473, 476, 5 L.Ed.2d 492 (1961) (noting that § 1983 targets those "who carry a badge of authority of a State ... whether they act in accordance with their authority or misuse it").

**9.** The *McDonnell Douglas* burden-shifting scheme applies to both Title VII and § 1981 claims. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989).

shifts to Defendant to articulate a legitimate, non-discriminatory reason for its actions. *See id.* Plaintiff then must be given the opportunity to show that Defendant's stated reasons are pretextual or a mere "coverup" for racially discriminatory action. *See* 411 U.S. at 804–05, 93 S.Ct. at 1825–26.

Plaintiff has asserted what are essentially three distinct discrimination claims in this case: 1) failing to promote Plaintiff to a position filled by a white employee; 2) discharging Plaintiff; and 3) retaliating against Plaintiff for Plaintiff's union grievances against Defendant.

### 1. *Discriminatory Failure to Promote*

■ In order to establish a prima facie case of discriminatory failure to promote, Plaintiff must demonstrate the following: 1) Plaintiff is a member of a protected class; 2) Plaintiff applied for the position in question; 3) Plaintiff was qualified for the position in question; and 4) Plaintiff was rejected under circumstances giving rise to an inference of unlawful discrimination. *See Carter v. Ball*, 33 F.3d 450, 458 (4th Cir.1994).

Beyond qualifying as a member of a protected class, Plaintiff has failed to establish any of the elements of a prima facie case of discriminatory failure to promote. First, Plaintiff never applied for the second pressman position awarded to Kevin Wells, nor was he legally entitled to an opportunity to do so. The second pressman position was not an entry-level position, but the third position in the progression of jobs within the printing department. Although it was Defendant's policy to post entry-level positions internally so that current employees could receive preferential consideration for those jobs, this policy did not extend to non-entry level positions. (Def.'s Resp. Opp'n Pl.'s Mot. Order Compelling Disclosure or Disc., attachment to Def.'s Resp. Pl.'s Interrogs.) Thus, Defendant had no duty to post the second pressman job internally, and Plaintiff had no corresponding right to apply under company policy.

■ Secondly, even if Plaintiff had applied for the second pressman position, he was not qualified. Plaintiff worked as a sheeter, an entry-level position in the printing department, and had not been trained to operate the press. Mr. Wells, on the other hand, had received such training. Plaintiff has presented no evidence whatsoever that he was qualified for the position of second pressman.

■ Plaintiff's lack of qualifications makes it virtually impossible for him to demonstrate the fourth element of a prima facie case, that he was rejected for the position under circumstances giving rise to an inference of discrimination. The position was a skilled one requiring training that Plaintiff did not have, and the position was eventually filled by a person who, unlike Plaintiff, had received such training. Plaintiff simply has presented no evidence that Defendant rejected him for discriminatory reasons or under questionable circumstances.

Plaintiff does assert that he assisted in training Mr. Wells for his new position and for that reason was just as qualified as Mr. Wells. However, even taking this fact in the light most favorable to Plaintiff, the fact remains that Plaintiff was a sheeter and that the job of second pressman was not next in the line of progression within the printing department. Moreover, Defendant had no responsibility to open the job to Plaintiff or others in the sheeter position because the job of second pressman was not an entry-level position. Plaintiff has failed to meet his burden of production on his claim of failure to promote.

## 2. Discriminatory Discharge

■ To establish a prima facie case of discriminatory discharge, Plaintiff must demonstrate that 1) Plaintiff is a member of a protected class; 2) Plaintiff was qualified for his job and was performing the job satisfactorily; 3) despite his qualifications and performance, Plaintiff was discharged; and 4) the position remained open to similarly qualified individuals after Plaintiff's discharge. *See Carter*, 33 F.3d at 458–59.

■ Plaintiff has made a partial showing of the elements required for a prima facie case of discriminatory discharge, but as before, his case ultimately falls short of what is required to survive summary judgment. Plaintiff has established that he is a member of a protected class, that he was qualified for the position of sheeter, and that he was discharged. However, Plaintiff has failed to demonstrate that he was performing satisfactorily at the time of his discharge. The evidence shows that Plaintiff committed a serious offense by failing to stay at his post until properly relieved, in violation of the collective bargaining agreement. (Arb. Op. at 12.) Moreover, a supervisor reminded Plaintiff of the rule only 24 hours before he committed the violation, and Plaintiff's co-workers confirmed on the day of the violation that he could be terminated for such conduct.

Plaintiff argues that this violation should not be held against him for several reasons. First, Plaintiff alleges he was not told that his replacement would be absent the night of January 16, and thus Plaintiff was unaware that he was needed to work overtime.[10] However, Plaintiff was expressly warned the previous night that he would need to work overtime if his replacement did not report to work. Moreover,

on the night of January 15, the last occasion on which Plaintiff's replacement had failed to report for work, Plaintiff was allowed to go home only after he asked for and received special permission to do so. Thus Plaintiff knew or should have known that he lacked the authority to make such a determination himself.

Plaintiff also asserts that the plant was not in continuous operations that night, and thus his machine did not need to be run during the third shift. Plaintiff has presented no evidence supporting this assertion. It is uncontroverted that Plaintiff was allowed to go home the previous night only after supervisors evaluated his output and determined that Plaintiff's machine was not needed during the third shift that night. At the same time, Plaintiff's supervisor reminded him that in the future, he would be required to stay over if his replacement had not arrived. (*Id.* at 4–5.)

■ Even assuming that Plaintiff had established a prima facie case, Defendant has articulated a legitimate, non-discriminatory reason for its action. *See McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824. Defendant disciplined Plaintiff for violating a clearly-established plant rule, just as it had done for other employees in the past.

Plaintiff, however, argues that Defendant's explanation is merely a pretext for discrimination, *see id.*, 411 U.S. at 804, 93 S.Ct. at 1825, because other employees who committed similar violations were given less serious sanctions than termination. In effect, Plaintiff alleges not only that Defendant's reasons are pretextual, but that the disparate treatment of Plaintiff as compared to those employees was itself racially discriminatory.

10. Plaintiff also points to the fact that his shift supervisor told him to "have a good weekend" as he left the plant on the night of January 16. However, the shift supervisor was in the office and could not see that Plaintiff's replacement was not at his post.

To establish such a claim of "discriminatory discipline," the following elements must be shown under the *McDonnell Douglas* burden-shifting scheme: 1) Plaintiff is a member of a protected class; 2) the prohibited conduct in which Plaintiff engaged was comparable in seriousness to the misconduct of employees outside the protected class; and 3) the disciplinary measures enforced against Plaintiff were more severe than those enforced against those other employees. *See Cook v. CSX Transp. Corp.,* 988 F.2d 507, 511 (4th Cir. 1993).

While the evidence does suggest that several other employees received less severe disciplinary sanctions than Plaintiff for walking off the job, Defendant has articulated legitimate, non-discriminatory reasons for the differences. *See id.* Tony Stanley, a white employee, was given a two-day disciplinary layoff. However, unlike Plaintiff, Mr. Stanley convinced his supervisors that he left his post without relief by mistake and promised it would not happen again. (Def.'s Mot. Summ. J., Seel Aff. ¶¶ 12–13.) Mary–An Anderson, also white, was given a three-week disciplinary layoff and six months' probation; however, she too expressed regret for her actions and was allowed to return to work only after agreeing to certain conditions. (*Id.* ¶¶ 12, 14.) By contrast, Plaintiff never expressed remorse for his actions and never agreed to obey the rule in the future. (*Id.* ¶ 12.) Therefore, Plaintiff has failed to meet his burden on either a discriminatory discharge or a discriminatory discipline claim.

### 3. *Retaliation*

To establish a prima facie case of retaliation, Plaintiff must demonstrate the following: 1) Plaintiff engaged in some protected activity; 2) Plaintiff's employer took adverse employment action against Plaintiff; and 3) a causal connection existed between Plaintiff's protected activity and the employer's adverse action. *See Carter,* 33 F.3d at 460. Although the temporal proximity of Plaintiff's protected action and the employer's adverse action can be indirect proof of a causal nexus, " 'mere knowledge on the part of an employer that an employee ... has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons' " for adverse action against Plaintiff. *Id.* (quoting *Williams v. Cerberonics, Inc.,* 871 F.2d 452, 457 (4th Cir.1989)).

Plaintiff claims that his discharge on January 27, 1998, was in retaliation for the grievance he filed on January 5, 1998, regarding the hiring of Kevin Wells.[11] Plaintiff has presented no evidence linking these two events other than their temporal proximity. Defendant, however, has presented substantial evidence of a legitimate reason for Plaintiff's discharge, as described above. Even assuming that Plaintiff met his burden of establishing a prima facie case by virtue of the temporal proximity of these events, Plaintiff has presented insufficient evidence to rebut Defendant's legitimate reasons. *See id.*

Plaintiff also alleges other forms of adverse treatment, including loss of his seniority after being reinstated, unfair investigations of his grievances by management, a supervisor's tone of voice being "out of order" on a given occasion, a supervisor's warning that Plaintiff's production rate was low, and a written warning for excessive absenteeism. (Compl. ¶¶ 16–'19.)

---

11. Plaintiff's EEOC charge was not filed until after his discharge, and thus is not part of Plaintiff's claim of retaliation.

Although Plaintiff filed grievances in response to these acts, he has presented no direct evidence suggesting a causal nexus between these adverse actions and any grievance filed. Indeed, the record reflects that most of Plaintiff's grievances were filed in response to various acts of Defendant, not the other way around.

■ Additionally, Plaintiff asserts that Defendant retaliated against him by terminating one of Plaintiff's grievance meetings after Plaintiff attempted to give a religious invocation, in violation of Plaintiff's First Amendment rights. However, Plaintiff is barred from pursuing this claim because he did not assert it in his EEOC charge or later amend his charge to reflect this claim. *See Leskinen v. Utz Quality Foods, Inc.*, 30 F.Supp.2d 530, 533 (D.Md. 1998) (only claims stated in original charge, reasonably related to original charge, and developed by reasonable investigation of original complaint may be raised in subsequent Title VII suit), *aff'd*, 165 F.3d 911 (4th Cir.1998).

## IV. CONCLUSION

For the reasons stated herein, the court will grant Defendant's Motion for Summary Judgment on each of Plaintiff's claims.

A judgment in accordance with this memorandum opinion shall be filed contemporaneously herewith.

### *JUDGMENT*

For the reasons set forth in the memorandum opinion entered contemporaneously herewith,

IT IS ORDERED AND ADJUDGED that Defendant's Motion for Summary Judgment [39] is granted.

IT IS FURTHER ORDERED that Plaintiff's Motion to Be Relieved of the Obligation to Pay for Mediator's Fee [24]

and Defendant's Motion to Strike Affidavits to Plaintiff's Response Brief [59] are denied. Plaintiff's Motion to Dismiss the Defendant's Answer [4] and Plaintiff's Motion to Dismiss the Defendant's Motion [61] are dismissed.